IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PAUL D'ANTUONO, as personal §
representative of the Estate of Linda §
Fenton, and ESTATE OF LINDA §
FENTON §
 §
V. §          ACTION NO. 4:07-CV-123-Y
 §
UNITED STATES OF AMERICA §

MEMORANDUM OF DECISION

This case was tried on the facts without a jury.  This memorandum of decision constitutes

this Court's specific fact findings and conclusions of law.  *See* FED. R. CIV. P. 52(a)(1).

I.  OPERATIVE FACTS[1]

A.  LINDA FENTON'S BACKGROUND

When Linda Fenton ("Linda") was 12, she was involved in a horrific car accident that

resulted in an organic brain injury.  As a result, Linda, who was previously a "delightful" girl,

became aggressive, was prone to explosive anger, and could not control her behavior.  While the car

accident and harm to Linda were tragic on their own, her adult behavior deteriorated to the point that

she was finally sentenced to 60 months' federal confinement for possession of methamphetamine.

This Court agrees with the sentencing court that Linda's organic brain disorder mitigated her

culpability for her conduct.  Linda was eventually transferred to serve her sentence at Federal

Medical Center--Carswell ("Carswell").  Linda's nickname at Carswell was "Little Bit," presumably

because of her small stature: less than 100 pounds and 4 feet, 9 inches tall.

---

[1]With the exception of what happened on February 23, 2004, the majority of these facts were stipulated to by
the parties.  (Joint Pretrial Order 4-21, 27-33.)

### B.  CARSWELL AND PRISONERS WITH MENTAL-HEALTH PROBLEMS

Carswell has special housing for prisoners with mental-health issues.  It is comprised of three units: (1) the M-1 unit for in-patient mental-health care; (2) the M-2 unit for out-patient care, including dispensing medications; and (3) the M-3 seclusion unit, which houses inmates on suicide watch, psychiatric seclusion, disciplinary segregation, administrative segregation, and those under diagnosis and observation.  The M-1 unit and the M-3 unit are located on the same floor of the mental-health section.  All staff assigned to work at any time within the mental-health section must be aware of the M-3 policies and procedures.  (Pls.' Ex. 17 at 8.)  The M-3 unit is normally staffed with one correctional officer and one nurse, who is also considered to be a correctional officer.  Each cell in the M-3 unit has a video camera in it; however, the video monitor is not checked with any regularity unless an M-3 prisoner is on suicide watch.  Indeed, because of privacy concerns, it is usual for the monitor to be turned off if the inmate is not on suicide watch.  Each cell door has a narrow, vertical window and a food slot in its door.

The M-3 unit is entered through a sally port, which is a double-door system of entry.  The outside door is opened with a key that is held by the M-2 officer.  Once a person enters the first door and locks it, the second door must be opened from the inside by the M-3 officer.  The other officer on the M-3 unit, usually the nurse, holds the key to the cell doors.  Additionally, all officers have a radio that contains a red button that, if pushed, sends an immediate general call for help from the control center.

Each unit has certain post orders that govern how the correctional officers perform their duties.  The post orders are different for each position and each correctional officer is required to familiarize himself with the post orders for the unit he is assigned to.  Officers assigned to the M-3

unit are required by post order to "inform Psychology Services and the Unit M1 nursing staff immediately of any concerns or changes in an inmate's mood." (Pls.' Ex. 17 at 30.) Further, M-3 officers and staff are informed that medical emergencies "require[] prompt action/reaction and immediate attention." (Pls.' Ex. 17 at 28.) The post orders state that immediate attention is required because "if the brain is deprived of oxygen and glucose for 4-5 minutes, brain cells begin to die, causing permanent brain damage or even death." (Pls.' Ex. 17 at 28.) The post orders further provide that a single inmate cannot be removed from his cell without two officers' being present.[2] (Pls.' Ex. 17 at 19.) The officers knew they could not "override" a post order without supervisory authorization.

In addition, the officers were required to attend yearly training on suicide prevention. As part of that training, the officers learned that a suicidal inmate must be in sight at all times. In fact, the training materials state: "[I]f you believe that an inmate is suicidal do not allow the inmate to be out of your direct sight from that time on." (Pls.' Ex. 16 at 14.)

## C. LINDA AND THE M-3 UNIT

During her time at Carswell, Linda would act in a more appropriate manner when she was housed in a "more open setting." However, Linda's behavior would often result in her placement in the M-3 unit. Indeed, Linda spent more than 60% of her incarceration time on the M-3 unit. While there, Linda frequently would threaten—and occasionally attempt—suicide. She tried to hang herself ten times and once tried to suffocate herself with a bag. She had been on suicide watch in the M-3 unit 18 times during her incarceration at Carswell.

The staff at Carswell was aware of Linda's mental disability and knew she was prone to

---

[2]There must be at least one more staff member present than the number of inmates to be moved.

erratic behavior.  Linda would become angry at perceived slights by Carswell staff or when she felt she was not getting her way.  Indeed, much of her behavior was manipulative.  However, her anger and resultant behavior were mostly reactionary.  In other words, Linda did not "store up" perceived slights and react much later.  Linda would quickly escalate in response to a stressor.  Several Carswell staff members had a good rapport with Linda and were able to calm her down if she became angry or if her behavior escalated.  After being calmed, Linda would often express sorrow for her behavior or would not remember her outburst at all.  In short, Linda was unpredictable.

### D.  FEBRUARY 23, 2004

Linda was to be released from custody on Wednesday, February 25, 2004.  In the weeks leading up to February 25, Linda became "increasingly anxious."  (Pls.' Ex. 192.)  During the weekend before her release,  Linda was told that she would not be able to shave her legs until her release date and that she would not be able to return to the M-1 unit to tell her friends good-bye. This disturbed Linda and she was angry and upset in varying degrees the entire weekend.

On February 23, Nurse Deborah Castner and Officer Joe Reamy were assigned to the M-3 unit.  When Castner reported for work that morning, she was informed by psychology services that Linda had been angry all week-end.  Indeed, Linda was still angry, but not yelling or screaming, when Castner arrived on the M-3 unit.  At 10:50 a.m., Castner began to deliver the lunch trays to the 15 prisoners who were on the M-3 unit that day.  Linda would not speak to Castner and merely turned her back, refusing her lunch tray.  Reamy testified that, while he was picking up the lunch trays, Linda demanded that Reamy call a Lieutenant Bishop, apparently to demand that he help her get transferred to the M-1 unit before her release.  When Reamy told Linda he would call Bishop later, she began to put toilet paper up to cover her window and told Reamy she was going to tie

4

something around her neck.  Linda then went completely silent and would not respond.  Linda made her threat and blocked the view of her cell at 11:21 a.m.  (Def.'s Ex. 34 at 71.)

Reamy attempted to call Bishop on his radio, but he was not on duty.  Reamy admitted he should have been aware that Bishop was not the supervisory lieutenant during Reamy's shift.  During the attempted call, someone told Reamy that Lieutenant Lori Sleigh was the supervisory lieutenant that day.[3]  Reamy then went to Castner's desk, which was about 35 steps away, to tell her what was going on and to ask her to try to get Linda to respond.  Castner hurried to Linda's cell door, looked through Linda's food slot, and saw a lump under the blanket on the bed.  Castner could not see Linda and, thus, assumed that Linda was under the blanket.  Linda would not respond to Castner.  While Castner was at Linda's cell door, Reamy went to the back of the unit to check the television monitor attached to the camera in Linda's cell.  He discovered that Linda had somehow covered the camera lens with toilet paper, which she had done before.

Reamy then contacted Sleigh at 11:24 a.m. and told her the situation.  Sleigh told Reamy to call a medical emergency if he believed something was wrong.  Reamy also called Dr. James Pederson in psychology services to inform him of Linda's suicide threat.  At 11:25, a medical emergency was called.[4]  (Def.'s Ex. 34 at 72.)  Reamy then went to the interior sally-port door to admit responders into the M-3 unit.  Neither Castner nor Reamy called the M-1 nurse after contacting Sleigh and Pederson.  As Reamy testified, the purpose of calling the M-1 nurse was to "get a third body there . . . to back [me] up to open that cell."  After the medical emergency was

---

[3]The supervisory lieutenant would be located in a separate office on the first floor of the mental-health section, two floors below the M-1 and M-3 units.

[4]Reamy called the medical emergency by calling the control room and not by pushing the red button on his radio.

called, Castner stood at Linda's cell door to await Sleigh's authorization to open the cell door. Castner estimated this could have been as long as four to five minutes. Although Reamy testified that he could not open the cell door until after the supervisory lieutenant arrived, this Court can find nothing in the post orders requiring or recommending that the supervisory lieutenant be present. The only directive about opening a cell door states that two staff members must be present to move one prisoner. Indeed, Sleigh testified that the supervisory lieutenant is not required to be present in a medical emergency.

At 11:26 a.m., Sleigh and Pederson arrived at the M-3 unit. At 11:27 a.m., six minutes after Linda threatened to kill herself and refused to respond, Sleigh authorized Castner to open the cell door. Sleigh went to the bed, pulled the blanket back, and saw that Linda had tied a portion of her sheet around her neck. Linda's face was already dark blue and she had no pulse. That same minute, Sleigh called a "code blue," which indicates a prisoner is in cardiac arrest. She radioed a request for additional medical staff while Castner went to get the crash cart. The crash cart was turned on at 11:35 a.m., and medical staff was able to shock Linda's heart until it began a normal rhythm. At 11:39 a.m., an ambulance was called, causing paramedics to arrive at 11:50 a.m. Linda was transported to a hospital at 12:30 p.m. At first, Linda was minimally responsive to family members. Sadly, Linda slipped into a coma three days later and died on March 2. The government paid Linda's hospital bills.

E.  THE AFTERMATH

On February 23, 2007, Linda's estate and the estate administrator ("Plaintiffs") filed suit against the government under the Federal Tort Claims Act ("the FTCA"). *See* 28 U.S.C.A. §§ 1346(b), 2671-80 (West 2006). Plaintiffs claimed Fenton's death was the result of negligence on

the part of Carswell's staff.  Specifically, Plaintiffs asserted that the staff's failure to follow specific

post orders and to act reasonably under the circumstances were the proximate cause of Fenton's

death.  The government moved for summary judgment, mainly on procedural grounds, which this

Court denied.  Trial to this Court was conducted without a jury from May 10 through May 14, 2010.

*See* 28 U.S.C.A. § 2402 (West 2006).


## II.  THE FTCA, IMMUNITY, AND PRISON EMPLOYEES

The FTCA narrowly waives the government's sovereign immunity and  provides a remedy

for any individual seeking recovery for damages caused by the negligence or wrongful act of an

employee of the federal government.  *See* 28 U.S.C.A. §§ 1346(b)(1), 2671-80.  The coverage of the

FTCA extends to federal prisoners, who may sue for injuries caused by the negligence of prison

employees.  *See United States v. Muniz*, 374 U.S. 150, 157-58, 165-66 (1963).  However, the

FTCA's restricted grant of jurisdiction is further limited by the discretionary-function exception:

> The provisions of . . . section 1346(b) . . . shall not apply to—
>
> (a) Any claim based upon an act or omission of an employee of the
> Government, exercising due care, in the execution of a statute or regulation, whether
> or not such statute or regulation be valid, **or based upon the exercise or
> performance or the failure to exercise or perform a discretionary function or
> duty on the part of a federal agency or an employee of the Government, whether
> or not the discretion involved be abused.**

28 U.S.C.A. § 2680(a) (emphasis added).  To determine if a claim is barred by the discretionary-

function exception, this Court applies a two-part test.  First, the conduct at issue must be

discretionary, involving an element of judgment or choice.  In short, if a federal employee violates

a mandatory regulation, immunity does not apply because the employee had "no room for choice

and the action will be contrary to policy."  *Gaubert v. United States*, 499 U.S. 315, 324 (1991); *see*

7

*Berkovitz v. United States*, 486 U.S. 531, 544 (1988). If the act is not discretionary, the exception does not apply and immunity does not attach.

Once it is determined that the act is discretionary, this Court then applies part two of the test by determining "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536; *see also Fang v. United States*, 140 F.3d 1238, 1241 (9th Cir. 1998). In other words, the discretionary-function exception will apply only if the discretionary action can be said to be grounded in regulatory policy. *See Gaubert*, 499 U.S. at 325. The focus of the second inquiry, then, is on the nature of the actions taken and whether such actions are susceptible to a policy analysis, that is, susceptible to the weighing of political, social, and economic judgments. *See id.* Of course, if the act is not discretionary in the first place, the policy analysis is not necessary. *See Bultema v. United States*, 359 F.3d 379, 383 (6th Cir. 2004).

It is not surprising that the government asserts that the staff's actions fell within the discretionary-function exception to the waiver of sovereign immunity. What is surprising is that the government waited to raise fully the exception until closing argument of the trial on the merits.[5] (See Def.'s 5/17/10 Bench Mem.) But because the discretionary-function exception to the government's liability implicates this Court's jurisdiction, delay does not constitute a waiver of the argument. The Court merely reminds the government that such arguments are more properly raised in an early motion to dismiss and not after a trial on the merits. *See* FED. R. CIV. P. 12(b)(1).

Be that as it may, this Court is required to determine whether the actions of Carswell staff were discretionary. It is clear from the evidence that the majority of the complained-of actions and inactions were not governed by a mandatory post order or directive and, thus, are shielded from

---

[5]As this Court noted in denying the government's motion for summary judgment, the government raised discretionary function only in passing—in two cryptic footnotes in its brief.

liability by governmental immunity.  But the post order requiring immediate contact of an M-1 nurse upon a change in a prisoner's behavior was mandatory and was not followed by Reamy or Castner.  *See Garza v. United States*, No. 04-41672, 2005 WL 3478009, at *2 (5th Cir. Dec. 20, 2005) (holding "straightforward and unambiguous" post order was a "specific directive" and gave prison guard no discretion).  Thus, immunity does not apply to this narrow claim.

Additionally, the mandatory suicide training required officers never to let a suicidal inmate be out of their direct sight line.  The language in the training manual is mandatory.  (Pls.' Ex. 16 at 14.)  Reamy testified that he was aware of the rule and knew he was required to keep Linda in view at all times once she threatened suicide.  In others words, there was no room for discretion once a suicide threat was made.  Because the training directive was given to the employees during their mandatory training, was in mandatory language, and was considered to be a mandatory rule, this Court concludes that the training materials' language was a mandatory directive, falling outside of the discretionary-function exception to governmental liability.  *See Berkovitz*, 486 U.S. at 536 (1988) ("[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."); *Jayvee Brand, Inc. v. United States*, 721 F.2d 385, 389 (D.C. Cir. 1983) (stating discretionary-function exception to liability does not apply when government employee fails to follow obligatory procedures in applying a rule that itself is exercise of discretion); *Appley Bros. v. United States*, 7 F.3d 720, 723 (8th Cir. 1993) (holding violation of mandatory handbook requirement not discretionary and, thus, government not immune); *Miller v. Whipker*, No. IP-02-924-C-JDT/TAB, 2004 WL 162212, at *19-23 (S.D. Ind. 2004) (consulting training materials and slide show to determine if official policy existed in context of § 1983 qualified immunity); *cf. Davis v. United States*, 597 F.3d 646, 650 (5th

Cir. 2009) (holding mandatory language in search-and-rescue manual did not make action nondiscretionary because manual allowed for deviation from specific, required procedures), *cert. denied*, 130 S. Ct. 1906 (U.S. 2010).[6]

## III.  NEGLIGENCE[7]

Under the FTCA, the government's liability is determined "in accordance with the law of the place where the act or omission occurred."  *See* 28 U.S.C. § 1346(b).  Plaintiffs' negligence claim, thus, is governed by Texas law.  Consequently, Plaintiffs must show by a preponderance of the evidence the existence of a legal duty to Linda, a breach of that duty, and damages proximately caused by the breach.  *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).  The government does not dispute that it owed to Linda a duty to exercise reasonable diligence to keep her safe and free from harm during her incarceration.  *See Jones v. United States*, 534 F.2d 53, 54 (5th Cir. 1976); *see also* 18 U.S.C. § 4042(a).  What it does dispute is that it breached that duty or that any such breach proximately caused Linda's death.  Proximate cause, which is a fact question, consists of foreseeability and cause in fact.  *See D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Tex. Dep't of Transp. v. Olson*, 980 S.W.2d 890, 893 (Tex. App.—Fort Worth 1998, no pet.).  Foreseeability requires evidence that a person of ordinary intelligence would have anticipated the danger his or her negligence creates.  *See S.W. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 274

---

[6]Even if training materials cannot be considered to be a mandatory directive or policy, this Court would conclude that the discretionary-function exception would not apply because Reamy's failure to keep Fenton constantly in sight is not the type of action grounded in policy.  (Plfs.' Resp. to Bench Mem. 10-12.)

[7]The government continues to assert that this is a medical-malpractice action governed by the Texas Medical Liability and Insurance Improvement Act.  (Joint Pretrial Order 49.)  For the reasons stated in the order denying the government's motion for summary judgment, this Court disagrees.

(Tex. 2002). Cause in fact inquires whether the negligent act or omission was a substantial factor in bringing about injury, without which the injury would not have occurred. *See Excel Corp. v. Apodaca*, 81 S.W.3d 817, 820 (Tex. 2002).

The evidence is clear that, on February 23, 2004, Reamy and Castner violated a mandatory post order when they failed to "inform . . . the Unit M1 nursing staff immediately" when Linda threatened suicide, blocked view of her cell, and went silent. This constitutes a breach the government's duty to exercise reasonable diligence to keep her safe. However, there is no evidence that this breach was a proximate cause of the harm to Linda. Although it could be inferred that the M-1 nurse would have arrived more quickly than did Sleigh because of the M-1 unit's proximity to the M-3 unit, when to open the door appears to have been within Reamy's discretion and it is clear from Reamy's testimony that he would not have opened the door to Linda's cell until Sleigh arrived. Thus, because the cell door would have remained closed until Sleigh arrived even if the M-1 nurse arrived first, the failure to immediately call the M-1 nurse cannot be considered a proximate cause of Linda's injury.

Also clear is that Reamy and Castner failed to keep Linda in direct sight after her suicidal threat, which was a violation of a mandatory directive. Reamy agreed that he did not follow the directive even though he was to do so "no matter what and keep her in view." This was a breach of duty. Proximate causation also exists. After threatening suicide, Linda covered the camera and the window to her cell before covering herself in a blanket. Reamy left the area to call Bishop, check the television monitor, and allow other responders entrance to the M-3 unit. Castner looked through the food slot, but could not see Linda. The only way Reamy or Castner could follow the directive was to open the cell door as soon as visual contact with Linda was broken. Thus, when

to open the cell door was no longer discretionary.  Had they opened the door, they would have discovered Linda's condition at least five minutes earlier.  The evidence shows that mere minutes are vitally important in suicide attempts.  (Def.'s Trial Br. 4.)  Every testifying staff member was aware that time is of the essence in the event of an attempted suicide.  The failure to follow the directive was a substantial factor in bringing about Linda's injury.  Further, it was foreseeable to a person of ordinary intelligence that allowing Linda to be out of sight after threatening suicide, in direct contravention of the training directive, was dangerous after Linda clearly stated she was going to strangle herself, blocked the view of her cell, and went uncharacteristically silent.

This Court finds that Plaintiffs have shown, by a preponderance of the evidence, that Reamy's and Castner's failure to keep Linda in sight after her threat was a breach of their duty to Linda and was a proximate cause of Linda's injury.


## IV.  DAMAGES

Plaintiffs assert that they are entitled to damages for economic loss, Linda's conscious pain and suffering, Linda's mental anguish, and Linda's apprehension of approaching death.  At the summary-judgment phase of this case, the government raised an argument that Linda must be held contributorially negligent for her percentage of responsibility in her death.  (Def.'s Summ. J. Br. 46-49.)  But the record is rife with testimony that Linda could not control her reactions when she became angry and that Carswell staff was well acquainted with Linda's brain injury and resultant loss of control.  This completely mitigates any responsibility on Linda's part for her own death.

Regarding damages, this Court finds that Plaintiffs are entitled to recover for Linda's funeral expenses.  *See, e.g., Landers v. B.F. Goodrich Co.*, 369 S.W.2d 33, 35 (Tex. 1963).  In fact, the

12

Court can find no argument raised by the government in the joint pretrial order to dispute Plaintiffs' entitlement to these damages once negligence is found. Thus, Plaintiffs are awarded $4,516, which represents the reasonable amounts Plaintiffs paid in funeral and burial expenses. (Pls.' Exs. 91, 92, 93; Joint Pretrial Order 25 at ¶ 198.)

Damages for Linda's pain and suffering are problematic. Pain and suffering may be established through circumstantial evidence. It may be inferred as a consequence of severe injuries, but some degree of consciousness is required to support such an award. Consciousness need not be complete or long in duration. This Court also may consider mental suffering, e.g., an apprehension of approaching death, as well as physical pain and suffering. *See generally* 19 William V. Dorsaneo III, *Texas Litigation Guide* § 292.03[3] (2010).

This Court cannot conclude that Linda was apprehensive of or even aware of approaching death. Linda had attempted to strangle or suffocate herself before, but Carswell staff timely intervened. Because of Linda's admittedly manipulative behavior, this Court believes, and so finds, that Linda did not intend to succeed in her attempt to kill herself and assumed that Carswell staff would intervene timely as they had always done before. Further, it does not appear that Linda feared death much. Her repeated suicidal behavior and her tortured life suggest she contemplated her own death without much fear or mental anxiety.

As for physical pain and suffering, there is scant evidence that Linda suffered any after her attempt. Although two family members testified that Linda would struggle to speak, wiggle her toes, appear muscularly tense, and once had her eyes open, the medical evidence shows that Linda was either heavily sedated, medicated with pain relievers, or comatose during her hospitalization. Further, the medical records uniformly show that Linda, although reactive to painful stimuli, showed

no sign of being in actual pain.  The Court determines that Plaintiffs have failed to show, by a

preponderance of the evidence, that Linda suffered physical pain and suffering.  *See Ballou v. Henri*

*Studios, Inc.*, 656 F.2d 1147, 1157 (5th Cir. Unit A Sept. 1981).


## V.  CONCLUSION

The preponderance of the evidence shows that the government breached a duty to Linda,
which was a proximate cause of her injury.  As such, Plaintiffs are entitled to recover for Linda's
reasonable funeral and burial expenses.  No award for pain and suffering is justified by the record.
SIGNED June 15, 2010.

*Terry R. Means*

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE